***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. The Full Commission hereby affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law, the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the injury giving rise to this claim, the parties were subject to and *Page 2 
bound by the provisions of the North Carolina Worker's Compensation Act.
2. At the time of the injury giving rise to this claim, Continental Tire was self-insured.
3. Plaintiff sustained a compensable injury by accident on December 17, 2003.
4. It is stipulated that all parties have been correctly designated and that there is no question as to the misjoinder or non-joinder of parties, and the parties are subject to the jurisdiction of the North Carolina Industrial Commission.
5. All applicable Industrial Commission forms including but not limited to Forms 18, 19, 22, 33, 33R and 60 may be received in evidence.
6. The records of Carolinas Medical Center, Piedmont Emergency Medicine, Presbyterian Orthopedic Hospital; Presbyterian Anesthesia, OrthoCarolina, Healthsouth, Pain Orthopedic Neurology, Healthsouth Surgery Center, Health Rehabilitation Psychologist of Charlotte, Brian Simpson, Ph.D., Southeastern Case Management and Corvel are genuine and authentic and are received into evidence:
7. Plaintiff's average weekly wage was $1,272.26, which yields a maximum compensation rate of $674.00.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the evidentiary hearing before the Deputy Commissioner, the plaintiff was a fifty three year old male, who worked as a mechanic at defendant-employer's tire manufacturing facility. His duties included the repair and maintenance of machines used in the *Page 3 
plant of defendant-employer. Plaintiff's job was very strenuous and involved a lot of heavy lifting and pulling on conveyor belts. These belts weighed anywhere from thirty pounds to in excess of seventy pounds. Plaintiff would also have to climb up on machinery and hold himself in position at heights as high as twenty to twenty five feet. Plaintiff is right handed.
2. On December 17, 2003, plaintiff sustained an injury to his right hand where his middle and ring finger were traumatically amputated by the chain and sprocket of a machine he was working on. Plaintiff was treated initially in the emergency room and then evaluated by orthopedist Dr. David Baker, who performed an extensive debridement of the long and ring fingers of plaintiff's right hand with amputation revisions.
3. Following surgery, Dr. Baker wrote plaintiff out of work and recommended supervised physical therapy and pain medication. Dr. Baker released plaintiff to return to work on January 12, 2004, with the restriction of no driving and no use of his right hand to perform work.
4. Plaintiff returned to Dr. Baker on February 18, 2004, and was concerned about swelling in his fingers after physical therapy sessions. Plaintiff was unsure of his work status due to conflicting or inconsistent information from his employer.
5. By March 18, 2004, Dr. Baker changed plaintiff's restrictions by lifting the no driving restriction and imposing a 20-pound lifting restriction with the right hand.
6. On April 22, 2004, Dr. Baker examined plaintiff, recommended additional therapy, and indicated that he felt plaintiff was well enough to work without restrictions.
7. On May 11, 2004, plaintiff returned to Dr. Baker reporting increased swelling in his fingers, with soreness and pain, since returning to work. Plaintiff told the doctor that at first, the swelling would resolve when he would have a couple of days off, but that it had become *Page 4 
more constant. Dr. Baker felt that plaintiff was not experiencing any new or different problems and advised that plaintiff wrap his hand.
8. Plaintiff returned to Dr. Baker on July 13, 2004, reporting pain in the remnants of his ring and long fingers of his right hand. Dr. Baker administered an injection to plaintiff's hand and allowed him to return to work without restrictions.
9. Dr. Baker re-evaluated plaintiff on August 31, 2004, noting that he had received relief from the prior injection, but had recurrence of his symptoms and was experiencing pain, tingling, and swelling in his long and ring fingers. The doctor discussed carpal tunnel syndrome with plaintiff, administered another injection and allowed him to return to work that day without restrictions.
10. On September 14, 2004, plaintiff returned to Dr. Baker reporting that he was "back to square one" and had numbness and tingling in the long and ring fingers. Dr. Baker noted positive Tinel's sign over the median nerve at the wrist and positive Phalen's sign for the median distribution, advised that nerve conduction studies be performed and recommended plaintiff return to work without restriction.
11. Defendant employer prepared a "Record of Communication" which is dated September 28, 2004. This document indicates that defendants expected employee to take corrective action for attendance and that plaintiff should not have "more than one occurrence in 60 days." Plaintiff disputed receiving this document at the time it was allegedly prepared.
12. On October 5, 2004, plaintiff reported to Dr. Baker that his pain and numbness have been getting worse. Dr. Baker examined the plaintiff, noted that the nerve conduction studies had been performed and was consistent with median neuropathy at the wrist and ulnar neuropathy at the wrist. The doctor advised that an open carpal tunnel release and *Page 5 
decompression of the ulnar nerve be performed upon plaintiff's right arm. The procedure was arranged and done on October 19, 2004.
13. Dr. Baker saw plaintiff post-operatively on November 2, 2004. He wrote in his note that plaintiff could return to a job that did not require use of his right hand beginning on November 15, 2004. On November 23, 2004, Dr. Baker examined plaintiff and noted that he was still concerned with swelling, but allowed him to return to work on jobs that did not require lifting, pushing or pulling greater than five pounds with the right hand, and recommended plaintiff continue in a supervised therapy program.
14. The plaintiff returned to Dr. Baker on January 6, 2005. Plaintiff had experienced Swelling of his fingers; the doctor recommended continued therapy and allowed plaintiff to return to work without restriction. On February 15, 2005, Dr. Baker examined plaintiff and again observed swelling, and allowed plaintiff to return to work without restrictions.
15. Defendant-employer prepared a "Record of Communication" dated February 15, 2005, indicating that plaintiff's performance was unsatisfactory due to "February 11, 2005 No Report."
16. Defendant-employer prepared a "Record of Communication" which is dated March 20, 2005. This document indicates that plaintiff was being suspended for two or more occurrences in violation of attendance guidelines, but does not indicate which dates plaintiff purportedly missed. Plaintiff testified he did not receive a copy of this document at the time it was prepared.
17. On March 31, 2005, defendant-employer issued a revised attendance policy.
18. On April 26, 2005, plaintiff was seen by Dr. Baker, who noted that plaintiff had been using his hand for work activities, but had to modify his methods and techniques to *Page 6 
accomplish his tasks. Dr. Baker felt that plaintiff was at maximum medical improvement at this point, and that he had seventy-five permanent partial impairments to both the long finger and right ring finger, which he equated to twenty-three percent permanent partial impairment of plaintiff's right hand. He released plaintiff from care and indicated he could work without restrictions.
19. On October 27, 2005, plaintiff returned to Dr. Baker reporting that he had experienced swelling, tingling, sensitivity and numbness in his right hand. Plaintiff described job duties which included working at heights of up to 25 feet, and having to use power tools. Plaintiff advised Dr. Baker that he did not trust his right hand to support his weight when he was working off of the floor. Dr. Baker recommended that additional nerve conduction studies be performed and indicated plaintiff could work without restrictions.
20. On December 13, 2005, Dr. Baker saw plaintiff who was again complaining of pain and numbness in his right hand. Plaintiff also advised that he was sensitive to the cold and that wearing his prostheses caused pain. Dr. Baker examined plaintiff and reviewed recent nerve conduction studies which showed abnormalities of both the median and ulnar nerves. He discussed cubital tunnel syndrome with plaintiff on this visit, advised plaintiff to take precautions to protect his nerves, and advised the use of an elbow pad. Dr. Baker allowed plaintiff to return to work without restrictions.
21. On January 24, 2006, Dr. Baker noted tenderness to palpation of the plaintiff's ulnar nerves and positive Tinel's signs. Dr. Baker noted that plaintiff had been experiencing pain in his hand, elbow and shoulder, and that the burning sensation in plaintiff's hand had worsened over the preceding five weeks. He recommended plaintiff refrain from doing any job that did not require lifting, pushing or pulling greater than five pounds with the right upper *Page 7 
extremity.
22. On January 26, 2006, defendant-employer terminated plaintiff for alleged absenteeism.
23. On March 23, 2006, plaintiff was seen by Anthony Wheeler, M.D. of Pain and Orthopedic Neurology. Dr. Wheeler reviewed plaintiff's medical record extensively. He noted plaintiff reported numbness, pain radiating up his forearm, and recurrent swelling of both amputated stumps. Plaintiff also described purplish discoloration, cold sensitivity, and cool skin temperatures, all of which occurred more frequently with over activity of the hand. Dr. Wheeler examined plaintiff's injury and noted that the proximal phalanges of plaintiff's amputated digits were cool compared to his other fingers. He also observed that plaintiff's fingers were highly sensitive and there was swelling of both amputation stumps. Dr. Wheeler's diagnosis was that plaintiff was suffering from post traumatic avulsion injury to the 3rd and 4th digits of his right hand with subsequent causalgia. He felt that plaintiff's pain was neuropathic and probably consistent with Stage I, Complex Regional Pain Syndrome II. Dr. Wheeler recommended plaintiff's treatment include: 1. Topical therapies including a lidoderm patch and compounded cream, 2. A trial of Lyrica, 3. Consideration of calcium channel blockers, 4. Consideration of trycyclic antidepressants, 5. Consideration of ipsilateral stellate blocks, 6. Resuming desensitization therapy, 7. Wearing a microfiber glove and 8. Re-evaluation in a month.
24. Plaintiff's neuropathic pain began at the time of his injury, while plaintiff's Complex Regional Pain Syndrome onset occurred prior to plaintiff's termination, when plaintiff began experiencing swelling and changes in his hand.
25. Plaintiff returned to Dr. Wheeler on April 19, 2006, reporting marked improvement in his pain between the neck and hand since starting the Lyrica. Dr. Wheeler noted *Page 8 
plaintiff might be a candidate for a right stellate block and that he had not yet received the compounded cream he had recommended. Dr. Wheeler urged plaintiff to obtain the compounded cream and continue his other medications.
26. On April 20, 2006, plaintiff returned to Dr. Baker. Dr. Baker noted plaintiff's improvement since being on medication that Dr. Wheeler had prescribed. Dr. Baker advised plaintiff to continue to treat with Dr. Wheeler due to the fact that there was nothing more that he could for plaintiff. Dr. Baker felt that despite the fact he released plaintiff to work without restrictions, plaintiff did in fact have functional limitations such as weakness in his right hand, and difficulty pinching and grasping objects with his right hand due to his injury.
27. On June 6, 2006, Dr. Wheeler re-examined plaintiff, noting that he reported improved pain control with the increased amount of Lyrica, and that the Lidoderm patches had helped with palmar pain. Plaintiff reported intermittent swelling of the right hand, and continued pain in the 3rd and 4th digits of the right hand. Plaintiff had still been unable to obtain the compounded cream. Dr. Wheeler recommended that plaintiff increase the amount of Zoloft he had been taking, and that he undergo a right stellate block.
28. On June 8, 2006, Rehabilitation Professional Vanessa Johnson, R.N., C.C.M. noted that she had been in contact with Dr. Wheeler's office and that Dr. Wheeler's plan included proceeding with a right stellate ganglion block.
29. Plaintiff returned to Dr. Wheeler's office on July 21, 2006. During this visit, it was noted that plaintiff's workers' compensation carrier had not received a request for the stellate block, that the doctor did not know why the request had not been made, and that issues surrounding plaintiff's workers' compensation case continued to trouble plaintiff. It was recommended that plaintiff resume taking Lunesta, that he obtain a pain psychology consultation *Page 9 
with Dr. Simpson, that he take numerous other medications, and that he obtain the stellate ganglion block as soon as possible.
30. On August 24, 2006, plaintiff was re-examined at Dr. Wheeler's office, where it was noted that he was still complaining of symptoms of dyesthesias and swelling, and that the pain psychology consultation he had recommended in the previous visit had been denied by workers' compensation. The recommendation was again for plaintiff to proceed with the stellate block and continue taking medications.
31. On September 26, 2006, Ronald VanDerNoord, M.D. performed another right stellate ganglion block. He noted a significant mitigation of his dysesthesias and felt that the procedure confirmed "a sympathetic component to [plaintiff's] overall pathology."
32. On September 27, 2006, plaintiff was evaluated by W. Brian O'Malley. Plaintiff advised that his difficulties had begun with his on the job injury on December 17, 2003, and described the treatment he had received for his injury. Plaintiff reported present complaints of pain and swelling in his right hand which were described as constant, becoming worse with time, and increased by activity. Plaintiff's expressed goals for treatment were to stop the pain in his hand and clarify his work status and opportunities. Dr. O'Malley diagnosed plaintiff as suffering from an adjustment disorder with mixed emotional features secondary to his pain and associated dysfunction. The doctor felt that it was to plaintiff's credit that he had made multiple efforts to return to work despite his injury. Dr. O'Malley further noted that plaintiff continued to make efforts to stay busy but was frustrated by the limitations imposed by his pain and swelling, accompanied by moderate emotional distress. Dr. O'Malley felt that plaintiff would benefit from a course of psychotherapy to assist him in developing strategies for managing his pain and emotional distress. *Page 10 
33. On October 18, 2006, Dr. O'Malley saw plaintiff in follow-up. Plaintiff reported that his overall pain and overall status were improved, due to the fact that his Lidoderm and Lyrica prescriptions had helped with his radiating pain. Dr. O'Malley noted that plaintiff continued to experience tingling pain in his hands, swelling in his hand with activity, and variability in his mood associated with his circumstances.
34. Plaintiff returned to Dr. O'Malley on October 30, 2006, reporting that his symptoms had worsened. Plaintiff expressed frustration with his inability to finish activities and indicated that he continued to experience swelling whenever he used his right hand. The doctor gave plaintiff audiotapes to help him practice relaxation exercises several times per day.
35. On November 1, 2006, plaintiff returned to Dr. Wheeler's office and was seen by Tina Kujawski, A.N.P. Plaintiff was advised to undergo another stellate block and to continue taking his medications.
36. On November 9, 2006, plaintiff received another right stellate ganglion block, performed by Dr. VanDerNoord. The doctor again noted that plaintiff had a diagnostic response to the procedure and hoped plaintiff would have "some delayed relief" from the procedure.
37. Plaintiff returned to Pain and Orthopedic Neurology on December 28, 2006, where it was noted that his overall improvement had been hindered by the interruption of his regular medications due to issues surrounding prior authorization. Plaintiff reported being out of medicine for two weeks as of this appointment, with resulting increased pain and strife. Plaintiff's right hand was noted to be cooler and paler than the left, with increased activity causing swelling and increased pain. The recommendation was for continued medication and the doctor's office strongly requested that workers' compensation approve at least 6 months of medications so plaintiff did not run out of them. A repeat stellate block was also recommended. *Page 11 
38. Plaintiff also saw Dr. O'Malley on December 28, 2006. Plaintiff was again having difficulty getting his medications filled on a reliable basis due to problems with prompt authorization by defendant-carrier. Plaintiff experienced a decline in his status and deterioration of his sleep with the discontinuance of the medications.
39. On February 13, 2007, plaintiff returned to Pain and Orthopedic Neurology. It was noted plaintiff had issues with anger management, which he partially attributed to being out of medication and having increased pain. Plaintiff advised that when he had all of his medications, his symptoms were well controlled, and although he was not pain-free, he could function in a more normal manner. Additional developing concerns of the doctor's included depression, anxiety and mood disturbance in plaintiff. Dr. Wheeler indicated that these problems were the result of a combination of the difficulties plaintiff had encountered since his injury as well as pre-existing personality issues. Plaintiff was given samples of his medication by the doctor and noted that he had been assured by the insurance carrier that there would be no further lapses in the medications.
40. Dr. O'Malley saw plaintiff on February 13, 2007. The doctor noted that plaintiff reported he had not done well during the past month, which he attributed to being unable to obtain his medication due to problems with his pharmacy and the insurance company. Plaintiff expressed frustration and anger about the care he had received, but the session concluded with plaintiff expressing continued interest in receiving psychotherapy.
41. Plaintiff returned to Dr. Wheeler's office on April 2, 2007. Dr. Wheeler recommended that plaintiff be evaluated by Dr. Simpson for assessment of depression and how it related to plaintiff's pain. Dr. Simpson noted that this was critical for many patients with reflex sympathetic dystrophy, but especially for plaintiff. The doctor also believed it was appropriate *Page 12 
to consider another stellate ganglion block with Botox for a more lasting effect than the prior injection.
42. On June 4, 2007, plaintiff was seen by Dr. Wheeler, reporting significant frustration and disappointment with continued right hand pain. Plaintiff expressed an interest in seeking a second opinion for treatment of his condition. Dr. Wheeler recommended continued treatment and follow-up, including the referral to Dr. Simpson.
43. On June 18, 2007, plaintiff saw both Dr. Wheeler and Dr. Simpson. Dr. Wheeler, noted that plaintiff's right hand symptoms persisted, and that plaintiff was likely suffering from some degree of bi-polar disorder which had been aggravated by his injury and chronic pain. Dr. Wheeler recommended another stellate block be performed, that plaintiff continue taking his medications and that he follow up with Dr. Simpson.
44. Dr. Brian Simpson, Ph.D., detailed plaintiff's medical history since he had been injured during the psychological consultation he performed on June 18, 2007. The doctor also noted plaintiff had returned to work twice after being injured, and had continued to work until being terminated from his position in January of 2006. Plaintiff stated that he believed he'd been terminated for having a work injury, that he'd had psychological care since being injured, but had not received any mental health treatment prior to his work injury. Dr. Simpson noted plaintiff was mistrustful of the insurance company, but denied any likelihood that he would act violently. Dr. Simpson felt that since plaintiff had sought mental health treatment when aggressive thoughts had become intense reflected judgment on plaintiff's part. Dr. Simpson's diagnostic impressions of plaintiff were that his problems included: Major depression versus Bipolar Disorder with Mixed Features; Pain Disorder with Psychological factors affecting his mental condition; and severe to catastrophic stresses relating to health, financial, occupational *Page 13 
and other life circumstances. Dr. Simpson recommended that plaintiff continue to receive psychological care and that his rehabilitation objectives must consider his mental status and emotional functioning.
45. There is no mention of attendance problems prior to plaintiff's December 17, 2003 injury in plaintiff's employment file materials in the record. Rick Schultheiss, the Human Relations Manager for defendant-employer testified that he was not aware of any evidence that the plaintiff's attendance was poor prior to December of 2003.
46. Plaintiff performed his duties as a mechanic during the period he was under restrictions and experienced considerable problems when he worked after his injury, including constant swelling and pain. Due to his pain and restrictions, there were work activities plaintiff could no longer perform by himself prior to his termination, and he relied upon coworkers to help him perform these tasks. The tasks plaintiff had difficulty performing included lifting objects, crawling up catwalk steps, and having to hold on to something to stay in place while using a tool with the other hand.
47. Plaintiff missed a number of days from work after being injured. Most of the days plaintiff missed were due to his injury.
48. Defendants did not have a clearly defined, nor consistently-enforced attendance policy prior to the memorandum of March 31, 2005. Three of the five reasons cited for terminating plaintiff occurred prior to March 31, 2005.
49. Defendant did not follow the policy delineated by their memorandum subsequent to March 31, 2005 in that they failed to issue plaintiff a citation, the first procedural step. Defendant's documents were inconsistent on the period of time during which an employee could have two or more absences. There was no provision in employer's attendance policy whereby an *Page 14 
employee could provide an excuse for an absence, even if the absence was due to their workers' compensation injury, after the absence had occurred.
50. Defendant's primary witness Rick Schultheiss, was unable to explain computer codes on attendance documents and testified that he was not involved in the disciplinary process until the suspension level. Mr. Schultheiss also testified that there was no way of tracking when an employee missed time due to their workers' compensation injury in their personnel file or from the attendance documents.
51. Defendant's documents indicate that plaintiff disputed the validity of defendant's disciplinary steps. Defendant's documents show that plaintiff indicated to defendant that absences, for which defendant disciplined plaintiff, were due to his workers' compensation injury.
52. Defendant did not show that plaintiff's alleged misconduct would have resulted in the termination of a non-disabled employee. Plaintiff was terminated for absences due to his compensable injury.
53. Plaintiff was not at maximum medical improvement at the time of his termination. Plaintiff's Chronic Regional Pain Syndrome was not diagnosed until approximately two months after he was terminated. Plaintiff was suffering from undiagnosed Chronic Regional Pain Syndrome during the time he was working and attempting to work for defendant. Plaintiff is still not at maximum medical improvement.
54. Plaintiff's injury is extremely painful, and the pain is continuously produced, which has caused plaintiff's sympathetic nervous system to become overactive. Plaintiff's injury reduces blood flow causing swelling, coolness and discoloration. The nature of plaintiff's injury inhibits the healing process, and the ripped nerve endings in his hand are very sensitive to *Page 15 
chemicals produced by his sympathetic nervous system.
55. In addition to his physiological injuries, plaintiff is suffering from psychological problems as a result of his compensable injury. Psychologist Dr. Brian Simpson noted plaintiff had continued to work until being terminated, and that plaintiff believed he had been terminated for having a work injury. Dr. Simpson's diagnoses included major depression versus bipolar disorder with mixed features; pain disorder with psychological factors affecting his mental condition; and severe to catastrophic stresses relating to health, financial, occupational and other life circumstances. Dr. Simpson recommended that plaintiff continue to receive psychological care and that his rehabilitation objectives must consider his mental status and emotional functioning. Psychologist W. Brian O'Malley diagnosed plaintiff as suffering from an adjustment disorder with mixed emotional features secondary to his pain and associated dysfunction. Dr. O'Malley felt that it had been to plaintiff's credit that he had made efforts to return to work despite his injury. Dr. O'Malley noted that plaintiff's pain and swelling in his hands caused increased irritability and plaintiff was self-conscious of his hand and his need to wear a glove to keep his hand warm.
56. Plaintiff's current psychological problems are causally related to the compensable injury by accident and the necessary treatment for that condition is reasonably necessary to provide relief, effect a cure or lessen the period of disability.
57. Plaintiff was prescribed numerous medications for his injuries by his authorized treating physician. Plaintiff's treating physician also recommended stellate blocks to both lessen his pain and further diagnose the nature of his injury. Defendant repeatedly delayed plaintiff's receipt of medications and treatment by not authorizing them in a timely manner. These delays exacerbated plaintiff's pain, worsened his condition due to the cumulative nature of having the *Page 16 
medication in his system consistently, and they caused or aggravated plaintiff's psychological condition.
58. Plaintiff looked for several jobs after being terminated by employer, but had been unable to find work and had been limited in his job seeking due to the medications he was taking, his restrictions and his mental state. The evidence indicates plaintiff was frustrated at his inability to return to work. Defendant's failure to promptly authorize prescriptions and medical procedures contributed to plaintiff's pain and psychological problems after his termination. Dr. Wheeler opined on March 29, 2007, that if plaintiff's mood was stabilized and outlying issues were resolved, plaintiff would be ready to begin looking for a job.
59. In light of the fact that plaintiff has not reached maximum medical improvement, and considering his restrictions, physical limitations, pain, medications, work history, psychological condition, defendant's repeated unwillingness to provide medication and treatment in a timely manner, and all other factors attendant in this matter, plaintiff has been and remains totally disabled from employment since his termination by defendant-employer on January 23, 2006.
60. In light of the fact that plaintiff has not reached maximum medical improvement, and considering his restrictions, physical limitations, pain, medications, work history, psychological condition, defendant's repeated unwillingness to provide medication and treatment in a timely manner, and all other factors attendant in this matter, plaintiff has been and remains incapable of work in any employment since his termination by employer.
61. Plaintiff made limited efforts to obtain employment after his termination, but was unsuccessful. In light of all factors, including the fact that he had not reached maximum medical improvement, that defendant delayed plaintiff's receipt of medications and medical procedures *Page 17 
which worsened plaintiff's condition, and in consideration of plaintiff's condition as a whole, even if plaintiff had been capable of some employment, his unsuccessful efforts to find employment were reasonable in light of all of the problems related to his injury.
62. Plaintiff's work experience was as a mechanic, he is right hand dominant, and his job required extensive use of his hands. Plaintiff was fifty one years old when he was terminated from his job and had a limited education, much of which related to his trade as a mechanic. Due to plaintiff's age, work experience, and education, it was futile for him to seek employment during the period after his termination due to his injury, even if he had been capable of some work.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Defendant failed to show plaintiff constructively refused suitable employment due to absenteeism. The evidence shows plaintiff's absences were attributable to his compensable injury. Plaintiff was not terminated for misconduct; (2) the same [alleged] misconduct would not have existed and therefore would not have resulted in the termination of a nondisabled employee; and (3) the termination was related to employee's compensable injury. Seagraves v. Austin Company ofGreensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996).
2. Plaintiff's current unemployment status is the result of job-related injuries, including the development of psychological problems related to his compensable injury. Defendant remains responsible for benefit obligations arising out of plaintiff's job-related injury, regardless of whether plaintiff was terminated for unrelated misconduct. McRae v. Toastmaster, *Page 18 Inc., 358 N.C. 488, 597 S.E.2d 695 (2004).
3. Plaintiff has made efforts to find work, which were reasonable in light of his injury and his efforts were unsuccessful due to his injury. Even if plaintiff were capable of some work, it has been futile thus far for him to seek employment after his injury and termination due to pre-existing conditions. Plaintiff is currently totally disabled from any employment until his condition improves and the rehabilitation concerns of his doctors are met.
4. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $674.00 per week for the period beginning January 24, 2006 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, including but not limited to the care he has received from: Carolinas Medical Center, Piedmont Emergency Medicine, Presbyterian Orthopedic Hospital, Presbyterian Anesthesia, OrthoCarolina, Healthsouth, Pain Orthopedic Neurology, Healthsouth Surgery Center, Health Rehabilitation Psychologist of Charlotte, and Brian Simpson, Ph.D., subject to the statute of limitations prescribed in section 97-25.1 N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay temporary total disability compensation to plaintiff at the rate of $674.00 per week for the period *Page 19 
beginning January 24, 2006 and continuing until further Order of the Commission. In as much of said compensation as has accrued shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
3. Defendant shall pay medical expenses incurred or to be incurred when medical bills have been submitted according to established Industrial Commission procedures.
4. As plaintiff has not reached maximum medical improvement, this Opinion does not address that issue. However, in the event that the parties should be unable to agree on the amount of permanent partial disability compensation which may be due plaintiff, either party may request a hearing from the Commission to resolve this matter.
5. Defendant shall pay the costs.
This the 14th day of October 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER *Page 1